Judy WALKER, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD (Sherbren Manufacturing and Nationwide Insurance Company), Respondents.

Rita McNaughton DeSANTO, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD (Sherbren Manufacturing and Nationwide Insurance Company), Respondents.

Charlotte HAAS, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD (Sherbren Manufacturing and Nationwide Insurance Company), Respondents.

Rebecca KUNSELMAN, Petitioner,

v.

WORKMEN'S COMPENSATION APPEAL BOARD (Sherbren Manufacturing and Nationwide Insurance Company), Respondents.

Commonwealth Court of Pennsylvania.

Submitted Dec. 7, 1994.

Decided March 10, 1995.

Joseph H. Ellermeyer, for petitioners.

Noble R. Zuschlag and James A. Mazzotta, for respondents.

Before DOYLE, McGINLEY, SMITH, PELLEGRINI, FRIEDMAN, KELLEY and NEWMAN, JJ.

DOYLE, Judge.

Judy Walker, Rita McNaughton DeSanto, Charlotte Haas, and Rebecca Kunselman (collectively, Claimants) appeal from four orders of the Workmen's Compensation Appeal Board reversing the determination of the referee that Nationwide Insurance Company was liable for the payment of compensation benefits due for Claimants' work-related injuries incurred on January 7 and January 9, 1987.

Claimants were employed as pressers for Sherbren Manufacturing, Inc. (Employer), a clothing manufacturer. While working on January 7 and January 9, 1987, they experienced nausea, dizziness, stomach and chest pains, fainting, and shortness of breath. On

February 26, 1987, Claimants filed claim petitions against Employer and Nationwide, alleging that they had sustained work-related injuries as a result of inhaling toxic fumes from a cleaning fluid used by Employer in the workplace.

Employer and Nationwide both filed timely answers denying Claimants' allegations. Employer further alleged that Nationwide was its workers' compensation insurance carrier on January 7 and 9, 1987. Nationwide, in its answer, denied that it was Employer's insurance carrier on these dates.

Hearings were held before Referee Lois W. Morrison [1] who found that the Claimants' injuries were compensable under the Workers' Compensation Act.[2] She also made the following findings of fact regarding the question of insurance coverage:

1. That on December 5, 1986 Nationwide Insurance Company mailed a Cancellation Notice to SherBren Manufacturing Company informing them that their Workers' Compensation Insurance Policy purchased for the term May 30, 1986 to May 30, 1987 was to be cancelled as of December 25, 1986 for non-payment of premiums.

2. That the cancellation notice was received by SherBren. Robin Coleman of SherBren's Accounting Department, discovered the notice in a file on January 15, 1987. Apparently this was SherBren's first acknowledgment of notification that its Workers' Compensation insurance had been cancelled.

3. That Ms. Coleman testified that she spoke to the local Nationwide agent, Paul (Pappy) Jones, on January 16, 1987. Agent Jones also had received a copy of the cancellation notice. Ms. Coleman stated that Mr. Jones told her to send two months premiums ($514.00) to Nationwide's Butler office.

4. That Ms. Coleman identified a letter and a copy of a check she sent to Nationwide Insurance Company tendering $514.00 to cover two months of unpaid premiums on Policy No. 54 WC 024–431–003. Said check and letter were mailed January 16, 1987; and was returned due to insufficient funds.

5. That Ms. Coleman admitted that the $514.00 check SherBren wrote was returned due to insufficient funds. SherBren alleges Nationwide was told to resubmit the check and that the check was never returned.

6. That between January 16, 1987 and January 28, 1987, SherBren received a Billing Statement requesting they pay Nationwide $4,981.00 by January 30, 1987. The statement indicated, on its face, that the sum of $3,283.00 was owed from a 'prior term' and that $1,698.00 was owed for the current premium period. The bill clearly stated that the total owed was for the period from May 30, 1985 to December 25, 1986.

7. That Robin Coleman further testified that she contacted Paul Jones about the Billing Statement and that he told her that the $3,283.00 was for the past due balance on the policy and that $1,688.00 of the total owed was a 30% down payment for a reinstatement of the cancelled policy. Ms. Coleman and SherBren had the money wired to Nationwide's Butler office on January 30, 1987.

8. That Nationwide sent a letter to SherBren on February 5, 1987. This letter stated that due to past payment problems Nationwide would not reinstate SherBren's policy and it would remain cancelled as of December 25, 1986.

9. That Ms. Coleman testified that she knew Mr. Jones was an agent for Nationwide but she did not know his status with the company. She testified that her belief that payment of $1,688.00 to Nationwide would constitute a 30% down payment to reinstate the policy was based upon statements made by Mr. Jones.

---

1. The referee held five hearings in 1987 and 1988, and Referee Morrison's decision was filed on December 16, 1988.

2. Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§ 1–1063.

10. That several SherBren employees testified they contacted Nationwide several times about filing information concerning the events of January 7th and 9th. They stated that Nationwide's employees cooperated with them and made no mention of the policy being cancelled until after February 5, 1987.

11. That Gerald L. Raab, underwriting supervisor for Nationwide Insurance Company, testified on its behalf. He explained Nationwide's dealings with SherBren following the issuance of the Cancellation notice. Mr. Raab stated that had the $514.00 check not been returned due to insufficient funds, Nationwide would have rewritten SherBren's policy, reinstating coverage back to the day the check was mailed, January 16, 1987. However, upon discovering the check was drawn on insufficient funds (which occurred February 3, 1987) Nationwide sent the cancellation letter dated February 5, 1987 which is referred to in Finding of Fact No. 8.

12. That Mr. Raab further testified that it was Nationwide's practice to *rewrite* cancelled policies, requiring payment of money owed and a 30% down payment on the premium for a new policy. (*Referee's Note:* Mr. Raab occasionally uses the word reinstate but clearly testified (Page 12, March 29, 1988 hearing) that the procedure involved writing a new policy.) Mr. Raab stated that this information was given to Mr. Jones to relay to SherBren.

13. That Mr. Raab testified that of the $4,981.00 billed to SherBren, $3,283.00 was for money owed from the policy written for the period May 30, 1985 to May 30, 1986 and that $1,688.00 was for premiums owed from May 31, 1986 to December 25, 1986, when the policy was cancelled. These amounts represented money not paid by SherBren which an audit revealed they owed. In no way did this bill represent any intention by Nationwide to reinstate coverage, Mr. Raab testified. *Your Referee finds Mr. Raab to be credible.* (Emphasis added.)

14. That Mr. Paul Jones, an independent agent for Nationwide Insurance Company, testified on its behalf. He stated that he had written SherBren's policy but that he had authority to bind Nationwide only on auto and home insurance policies. He lacked any authority to reinstate a Workers' Compensation policy. Mr. Jones further testified that it was his understanding, based upon information given to him by Robin Coleman, that SherBren needed to pay $4,981.00 to cover a $3,283.00 balance owed, and to put a $1,704.00, 30% down payment, on an "86—87" policy. (3/29/88 Hearing, Page 25) Mr. Jones forcefully denied that the payment of the 30% down payment would reinstate coverage during the period in question. Mr. Jones could not recall ever having a conversation with Robin Coleman concerning sending $514.00 to Nationwide to reinstate the policy. Furthermore, Mr. Jones opined that Nationwide would have rewritten the policy back to January 16, 1987 if the $514.00 check had not been returned for insufficient funds. He admitted he could not recall if it had been made clear to SherBren that a rewritten policy would not reinstate coverage for the period of December 25, 1986 to January 16, 1987.

15. That Mr. Raab testified that a copy of the original December 5, 1986 Cancellation Notice would have been sent to the Penna. Compensation Rating Bureau. However, SherBren Exhibit No. 3, a letter from the Ratings Bureau reports that they have no record of SherBren's insurance being cancelled; and that Nationwide is indicated as the carrier in January and February 1987. However, the Rating Bureau's audit report shows a SherBren—Nationwide short term policy from May 30, 1986 to December 25, 1986.

16. *That your Referee finds the testimony of Paul Jones credible in establishing as fact that any statements he made concerning the payment of $4,981.00 by SherBren constituting, in part, a down payment on a reinstated policy were based upon what Robin Coleman told him and were not instructions from Nationwide. Your Referee finds the testimony of Robin Coleman on this issue less credible.* (Emphasis added.)

(Referee Morrison, Findings of Fact regarding Nos. 1–16 (regarding insurance issue).) Based on these facts, Referee Morrison determined that Claimants had met their burden of proof to establish their claims, imposed counsel fees on Employer for an unreasonable contest under Section 440 of the Act,[3] but held that Nationwide was not liable for the compensation payments to Claimants, since Employer's insurance coverage had been cancelled prior to the date of injury.[4]

Claimants appealed Referee Morrison's decision regarding insurance coverage to the Board. The Board reversed the referee's decision to the extent that it found Nationwide liable because of Nationwide's failure to file a notice of cancellation with the Pennsylvania Compensation Rating Bureau. Nationwide then filed a petition for rehearing with the Board.[5] The Board then decided to remand the case to the referee for further hearings on the sole issue of whether Nationwide was liable for the payment of compensation benefits.

On remand, Referee Geoffrey L. Seacrist held hearings during 1991 on the issue of Nationwide's liability. However, the only additional evidence submitted by the parties were certain papers belonging to Paul Jones, the Nationwide agent who had handled Employer's workmen's compensation insurance policy. On the basis of these papers and the prior record, Referee Seacrist made the following findings of fact:

1. No evidence whatsoever was introduced tending to establish the date when notice of cancellation effective December 25, 1986, was either mailed by Nationwide or received by the defendant employer. The notice bears a date of December 5, 1986, but that by itself does not tend to prove that it was mailed that date.

2. Your Referee adopts findings of Fact Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, *13*, 14, 15, *and 16* as set forth in Referee Morrison's decision of December 16, 1988, as his own findings of Fact Nos. 2(a) through 2(*o*) respectively. (Emphasis added.)

3. Paul "Pappy" Jones (herein "Jones") was an authorized insurance agent for Nationwide, and not a mere broker of insurances.

4. Sherbren Manufacturing dealt with Jones at all material times with respect to its insurance against potential workers' compensation liabilities, both with respect to securing coverage and payment of premiums; unless and until his office would instruct them to make direct contact with Nationwide's offices in Butler or elsewhere.

5. Sherbren Manufacturing had a history of missing premium due dates and then contacting Jones and curing their defaults by late payments made under his auspices; prior to this coverage dispute arising.

6. Nationwide did not clearly communicate to Sherbren that its policy was truly cancelled as of December 25, 1986, and was not reinstated by its $4,981.00 payment, until its letter of February 5, 1987, was mailed to Sherbren. Until that point, Sherbren reasonably believed that their default was being cured by the payment of both accrued and advance premiums totalling $4,981.00, based upon their verbal communications with Jones and Nationwide's Butler office personnel.

---

3. 77 P.S. § 996.

4. Employer is insolvent.

5. Nationwide also filed a petition for review with this Court. However, we remanded the case to the Board and relinquished jurisdiction when the Board granted the petition for rehearing.

7. Sherbren's representative had called Jones beginning January 9, 1987, to inquire about reporting the subject injury/disease claims arising out of events which occurred on January 7 and 9, 1987; and finally he told them on January 12, 1987, that they should call Nationwide's Butler office. They called ... Butler; and were instructed as to how to file the claims, but were not told that they had no coverage for these claims. Sherbren's representatives again called Nationwide's Butler office to report additional claims information on February 3 and 5, 1987; and during the February 5 call, a Nationwide employee raised a coverage issue with them.

8. Beginning February 5, 1987, Sherbren Manufacturing was clearly aware that Nationwide had cancelled their workers' compensation insurance coverage, and their efforts after that date were clearly directed toward trying to convince Nationwide to reverse that determination; but before that date, Sherbren reasonably believed that it had cured its default problem and that coverage had been reinstated, in light of its course of dealings with Nationwide and its agent Jones.

9. No evidence of record indicates that Sherbren Manufacturing or the particular individual employees handling its insurance matters understood the difference between reinstated and reissued policies, and a common lay person would not be presumed to understand that distinction, particularly in light of the history of curing defaults by late payments.

10. The language of the billing which requested payment of the $4,981.00 was not so clear and plain that Sherbren and its involved employees would understand that such payment would not cure their coverage problem, particularly in light of the ongoing discussions with Jones and Nationwide's Butler office concerning what it would take to get the problem worked out.

11. The circumstantial evidence presented through the record of the Pennsylvania Ratings Bureau tends to indicate that Nationwide had not made their decision to stick with a cancellation until at least February 5, 1987. Nationwide never did report a cancellation, and only reported a 'short-term policy' with coverage ending December 25, 1986, reflected in the Rating Bureau's 'unit statistical report (audit).'

(Referee Seacrist, Findings of Fact Nos. 1–11.) Based on these findings of fact, Referee Seacrist concluded that Nationwide was liable for the workers' compensation payments.

Nationwide appealed this decision to the Board. Nationwide also requested a supersedeas at this time. The Board granted a supersedeas with respect to costs and medical expenses, but denied relief with respect to Claimants' weekly indemnity benefits. Claimants petitioned for reconsideration, arguing that the Board did not have the authority to grant a supersedeas for medical expenses. After holding a hearing on this matter, the Board denied Claimants' request to revoke its grant of a supersedeas for costs and medical expenses.

On the issue of Nationwide's liability for compensation payments, the Board reversed the decision of Referee Seacrist. The Board concluded that (1) Referee Seacrist's finding that there was no evidence tending to show when notice of cancellation was either mailed or received was not supported by substantial evidence; (2) Referee Seacrist's finding that Nationwide, either directly or through Jones, agreed to reinstate coverage was not supported by substantial evidence; (3) Referee Seacrist's conclusion that Nationwide was estopped from denying that it had reinstated coverage is erroneous;[6] (4) there is no legal basis for finding that Nationwide's cancella-

---

**6.** The Board stated that Referee Seacrist had misapplied the doctrine of estoppel in two ways. First, Employer did not rely to its detriment on conversations between itself and Nationwide or Jones because they occurred *after* the policy's cancellation date and the date of Claimants' injuries. Second, Employer did not reasonably rely on a prior course of conduct regarding the curing of late payments since all other defaults had been cured *before* the policy was cancelled.

tion is ineffective because it failed to file a cancellation notice with the Rating Bureau; and (5) if Nationwide was required to provide coverage for a pro rata share of the policy year based on the premiums actually paid by Employer, then Employer's coverage would have expired on January 5, 1987.[7] This appeal followed.[8]

Claimants argue the following on appeal: (1) the Board erred in concluding that Nationwide was not Employer's insurance carrier when Claimants suffered their work-related injuries; (2) the Board exceeded its authority by usurping the referee's role as fact finder; (3) the Board exceeded its authority by granting Nationwide a supersedeas for medical benefits; and (4) Nationwide is collaterally estopped from denying liability for compensation payments because of its withdrawal of its appeal to the Board in the case of *Burdett v. Sherbren Manufacturing.*[9]

## I. INSURANCE COVERAGE

We first consider Claimants' argument that Nationwide was the insurance carrier for Employer at the time Claimants sustained their work-related injuries.

Claimants argue that Nationwide should be found to have agreed to retroactively reinstate coverage to December 25, 1986, since Employer reasonably relied upon the actions and words of Nationwide's Jones that Nationwide was providing continuous workers' compensation coverage, and since Nationwide knew, or should have known, that the actions and representations of its agent would reasonably induce lay people into believing that he could bind Nationwide to ongoing coverage. This argument involves principles of both "equitable estoppel" and "apparent authority." We first discuss Claimant's argument as it relates to equitable estoppel.

■■■ The doctrine of equitable estoppel applies "where one party through its acts (1) negligently misrepresents material facts (2) knowing or having reason to know that the other party will justifiably rely upon the misrepresentation to its detriment and (3) the other party so relies." *Williams v. Workmen's Compensation Appeal Board (Realty Services Co.)*, 166 Pa.Commonwealth Ct. 276, 282, 646 A.2d 633, 636 (1994).[10]

■■■ Under the facts of this case as found by Referees Morrison and Seacrist, Claimants have failed to prove the existence of these three elements needed to establish equitable estoppel. We agree with the Board that Referee Seacrist's contrary conclusions are not supported by substantial evidence. First, Nationwide or its agent is not guilty of misrepresentation. Although on January 30, 1987, Employer paid Nationwide $4,981.00, part of which it believed was to be used to reinstate its policy, this was not the result of any misrepresentation on the part of Nationwide. Referee Morrison found that any statements made by Jones, which might have indicated that the policy would be reinstated if this money were paid were in response to what he had been told by Robin Coleman, a member of Employer's accounting department, and not based on instructions from Nationwide. (Referee Morrison, Finding of Fact No. 16.) The fact that Employer may have been confused about the true status of its insurance policy, or that Employer's employee believed that the policy had been rein-

---

7. This would have been two days prior to the first date of injury in this case. Therefore, even if Nationwide were required to provide pro rata coverage, Claimants' injuries would not be covered.

8. Our scope of review is limited to determining whether an error of law was committed, constitutional rights were violated, or whether necessary findings of fact are supported by substantial evidence. Section 704 of the Administrative Agency Law, 2 Pa.C.S. § 704; *Magayna v. Workmen's Compensation Appeal Board (Jones & Laughlin Steel Corp.)*, 115 Pa.Commonwealth Ct. 268, 539 A.2d 952 (1988).

9. Although Claimants maintain in their brief that Nationwide withdrew its appeal of Referee Seacrist's identically worded decision in *Burdett v. Sherbren Manufacturing*, No. 193–42–2264 (December 16, 1991), the record contains no evidence in support of that allegation.

10. The party claiming equitable estoppel has the burden of proving it by clear and convincing evidence. *Bayush v. Workmen's Compensation Appeal Board (Conemaugh Township)*, 111 Pa.Commonwealth Ct. 617, 534 A.2d 853 (1987).

stated, does not prove that the insurance company is guilty of misrepresentation. Employer, as an ongoing manufacturing establishment, presumably has a higher level of sophistication in business matters, including insurance, than the ordinary consumer. Nationwide could only be responsible for Employer's misconceptions if it acted in such a way as to foster them; it was not unreasonable for Nationwide to assume that Employer understood the communications sent to it in the ordinary course of business. Claimants have the burden of establishing that Nationwide misled Employer, either negligently or intentionally. In this case, they have not done so and equitable estoppel cannot apply. Referee Morrison found the testimony of Nationwide's witness, Raab, and Jones credible (Referee Morrison, Findings of Fact Nos. 13 and 16), and the testimony of Employer's witness, Robin Coleman, "on this issue less credible." (Referee Morrison, Finding of Fact No. 16.) Referee Seacrist adopted these findings. (Referee Seacrist, Finding of Fact No. 2.)

Second, Employer suffered no detriment under the facts of this case. When Employer paid the $4,981.00 to Nationwide, it may well have *believed* that its insurance was thereby being reinstated. Employer might have even refrained from making this payment if it had realized that this payment was for premium arrearages and would not result in the reinstatement of its policy. However, the payment of a legally binding debt does not constitute a detriment. *See Warren Tank Car Co. v. Dodson,* 330 Pa. 281, 199 A. 139 (1938). Since Employer's payment of $4,981.00 fulfilled a lawful obligation to Nationwide, Employer suffered no detriment by this payment.

Third, Employer could not have detrimentally relied on the actions of Nationwide since the actions which supposedly induced Employer's reliance occurred after January 7 and 9, 1987, the dates of Claimants' injuries, when Employer's insurance policy had already been cancelled. Employer did not contact Agent Jones or Nationwide to discuss the cancellation of its insurance policy and the possibility of its reinstatement until after January 15, 1987. Also, as discussed above,

Employer did not send Nationwide any money in an attempt to reinstate its policy until January 30, 1987. Only if these events had occurred *prior* to January 7 and 9, 1987, and Employer had foregone obtaining alternate insurance based on these events, could we find Nationwide estopped from denying coverage. Therefore, even assuming that Employer would have reasonably interpreted Nationwide's actions after January 15, 1987, as reinstating coverage, Employer would not have suffered a detriment since the date of Claimants' injuries had already passed and Employer was in no worse position than it was before.

We now turn to Claimants' argument that Jones had the authority to bind Nationwide to continuing workers' compensation coverage for Employer. Jones gave uncontroverted testimony that he had the authority to bind Nationwide on automobile and home insurance policies only, and lacked the authority to reinstate a worker' compensation policy. (Referee Morrison, Finding of Fact No. 14.) Thus, there is no question that Jones did not have express or implied authority to bind Nationwide on workers' compensation policies.

Nevertheless, Claimants maintain that even if Jones had not been given the authority to bind Nationwide, he still had the apparent authority to do so. The general rule governing the creation of apparent authority is found in Section 27 of the Restatement (Second) of Agency. It states:

> Except for ... conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by ... *conduct of the principal which, reasonably interpreted, causes the third person to believe* that the principal consents to have the act done on his behalf by the person purporting to act for him.

Restatement (Second) of Agency § 27 (1958); *Hartley v. United Mine Workers of America,* 381 Pa. 430, 113 A.2d 239 (1955). Unfortunately for Claimants in this case, there is nothing in the record which establishes that Nationwide acted in such a way as to make Employer reasonably believe that Jones had the authority to unilaterally reinstate the

workmen's compensation insurance policy. Simply because Jones was an agent of Nationwide does not mean that he had the authority to bind the company for all purposes or that Employer could reasonably infer that he did. Robin Coleman, Employer's principal witness and a member of Employer's Accounting Department, testified that she did not know Jones' status with Nationwide. (Referee Morrison's Finding of Fact No. 9.) Employer's mere belief that Jones had authority to bind Nationwide, without proof of conduct on the part of Nationwide to justify that belief, is insufficient to establish that he had apparent authority.

Furthermore, the direct contacts which Employer did have with Nationwide do not suggest that Nationwide lead Employer to believe that it had reinstated Employer's insurance policy or that Jones had the authority to do so. These contacts, all of which occurred after the date of injury, concerned only matters relating to the filing of claims with Nationwide. The subject of the reinstatement of Employer's insurance was not mentioned in these conversations, and Nationwide did not do or say anything which would have suggested that the insurance was reinstated. For the above stated reasons, we conclude that Employer's belief that Jones had the authority to reinstate its policy and had in fact done so was unfounded.

## II. FACT–FINDING FUNCTION OF BOARD

Claimants also argue that the Board in making its decision in favor of Nationwide usurped the power of the referee as fact finder. Claimants correctly state that the Board must accept the findings of fact made by the referee unless they are not supported by competent or substantial evidence. *Universal Cyclops Steel Corporation v. Krawczynski*, 9 Pa.Commonwealth Ct. 176, 305 A.2d 757 (1973). However, Claimants

have failed to show that the Board deviated from this standard.

The Board found that the following findings of Referee Seacrist were not supported by substantial evidence: (1) evidence was not presented establishing when notice of cancellation was mailed or when it became effective; and (2) Nationwide, either directly or through Jones, agreed to renew coverage with Employer. In making this determination, the Board did not engage in new fact-finding or substitute its own findings for that of the referee. Rather, the Board properly determined that these findings were inconsistent with and unsupported by the record it had before it.

Furthermore, the findings of Referee Seacrist which were questioned by the Board are really not factual determinations, but rather legal conclusions. Whether Nationwide's conduct was sufficient to cancel the original policy and whether Nationwide was estopped from denying that the policy was subsequently reinstated through its actions are questions of law. As such, they can properly be reviewed by the Board and this Court on appeal. The Board accepted the credibility determinations of both referees; it rejected those legal conclusions which were either unsupported or contradicted by those facts. We find that the Board's action was proper and concur in its conclusions.

## III. CONCLUSION

Claimants have failed to demonstrate that Nationwide was Employer's insurance carrier on the dates Claimants were injured. Claimants' argument that Nationwide is estopped from denying coverage must be rejected for the reasons enumerated above. Also, we find that the Board did not usurp the referee's role as fact finder and acted properly in reversing his decision. Claimants' final two arguments do not change the outcome of this case and need not be addressed.[11]

---

11. Since we conclude that Nationwide was not Employer's insurance carrier, Claimants' argument that the Board improperly granted Nationwide a supersedeas for medical benefits is rendered moot. We also summarily dismiss Claimants' allegation that Nationwide was collaterally estopped from denying coverage because of its

withdrawal of its appeal of *Burdett v. Sherbren Manufacturing*. We do not need to address the merits of this claim since the record contains no evidence that the appeal was in fact ever withdrawn. *See Naffah v. City Deposit Bank*, 339 Pa. 157, 160, 13 A.2d 63, 64 (1940) ("a court may not ordinarily take judicial notice in one case of

Accordingly, we affirm the decision of the Board reversing the referee's determination that Nationwide was liable for the payment of compensation benefits due for Claimants' work-related injuries on January 7 and 9, 1987.

### ORDER

NOW, March 10, 1995, the orders of the Workmen's Compensation Appeal Board in the above-captioned matters are hereby affirmed.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. Because I believe that Nationwide Insurance Company (Nationwide) was the insurance carrier for Sherbren Manufacturing, Inc. (Employer) when Judy Walker, Rita McNaughton DeSanto, Charlotte Haas, and Rebecca Kunselman (collectively, Claimants) sustained work-related injuries on January 7 and January 9, 1987, I would reverse the decision of the Workmen's Compensation Appeal Board (Board) and hold Nationwide liable for the payment of compensation benefits to Claimants. In addition, because I believe that the Board lacks authority to grant a supersedeas with respect to the payment of medical benefits, I would vacate the Board's grant of supersedeas here.[1]

## I. INSURANCE COVERAGE

Unlike the Majority, I believe that the Board erred in concluding that Nationwide was not Employer's insurance carrier when Claimants sustained their work-related injuries. Rather, I agree with Claimants that Nationwide cannot deny that it agreed to retroactively reinstate Employer's insurance coverage to December 26, 1986 because (1) Employer reasonably relied upon the actions and words of Nationwide's agent and employees that Nationwide was providing continu-

ous workmen's compensation coverage and (2) Nationwide knew or should have known that the actions and representations of its agent would reasonably induce lay people to believe that its agent could bind Nationwide to ongoing coverage. As the Majority notes, this is a two-step argument, the first involving the doctrine of equitable estoppel and the second based on the rule of apparent authority. I will examine each in turn.

### A. Equitable Estoppel

The doctrine of equitable estoppel applies "where one party through its acts (1) negligently misrepresents material facts (2) knowing or having reason to know that the other party will justifiably rely upon the misrepresentation to its detriment and (3) the other party so relies." *Williams v. Workmen's Compensation Appeal Board (Realty Services Co.),* 166 Pa.Commonwealth Ct. 276, 282, 646 A.2d 633, 636 (1994). I believe that Employer has proven all three of these elements.

### 1. Negligent Misrepresentation

First, I am convinced that local Nationwide agent Paul "Pappy" Jones negligently misrepresented material facts to Employer. "A misrepresentation is an assertion that is not in accord with the facts." Restatement (Second) of Contracts § 159 (1981). An assertion need not be fraudulent to be a misrepresentation; a statement intended to be truthful may be a misrepresentation because of ignorance or carelessness. Restatement (Second) of Contracts § 159 cmt. a (1981).

The findings clearly indicate that Nationwide told Jones that it would reissue, *not* reinstate, Employer's policy *if* Employer would pay all past due amounts and make a 30% down payment on a new policy. (Referee Morrison's Finding of Fact, No. 12.) Yet, when Employer questioned Jones in January of 1987 about the audit bill for $4,981, Jones

the records of another case, whether in another court or its own, even though the contents of those records may be known to the court.")

1. Nationwide appealed the referee's decision to the Board and requested a supersedeas, which was granted with respect to costs and medical expenses, but was denied with respect to Claimants' weekly indemnity benefits. Claimants peti-

tioned for reconsideration, arguing that the Board lacked authority to grant a supersedeas for medical expenses, and the Board held a hearing on the matter. After giving due consideration to the petition, the Board denied Claimants' request to revoke its grant of supersedeas for costs and medical expenses.

told Employer that this amount represented all monies past due and a 30% down payment on a *1986–87* policy. (Referee Morrison's Finding of Fact, No. 14.) In representing that the new policy would cover *both* 1986 and 1987, Jones was saying that, upon payment of the $4,981, Nationwide would "reinstate" coverage to include the last few days of December, 1986. As indicated above, however, the $4,981 only covered the balance owed for the period *ending* December 25, 1986 and did not include a 30% down payment on a reinstated or a reissued policy. Thus, Jones misrepresented material facts to Employer.

The Majority, in support of a contrary view, makes much of the fact that Jones based his misrepresentation upon what Employer told him over the telephone regarding the contents of the audit bill. (Referee Morrison's Finding of Fact, No. 16.) However, this does not alter the fact that Jones made the misrepresentation. Nor does it excuse Jones for negligently failing to inquire of Nationwide regarding the audit bill if he was uncertain of its purpose. As noted above, an assertion made out of ignorance or carelessness is still a misrepresentation.

### 2. Justifiable Reliance

Next, the Majority concludes that Jones had no reason to know that Employer would justifiably rely to its detriment upon Jones' misrepresentation. However, I have found much in the record to suggest an opposite conclusion. First, Employer dealt exclusively with Jones as to insurance matters. (Referee Seacrist's Finding of Fact, No. 4.) Second, Employer had a history of missing premium due dates and then curing the default through the intercession of Jones. (Referee Seacrist's Finding of Fact, No. 5.) Third, when Employer telephoned Nationwide on January 12, 1987 and on February 3, 1987, as Jones instructed, concerning the filing of

workmen's compensation claims for the injuries of January 7 and January 9, 1987, neither Jones nor Nationwide questioned Employer's coverage. (Referee Seacrist's Finding of Fact, No. 7.) Finally, Jones could not remember if he explained to Employer's staff the difference between a "reissued" policy and a "reinstated" policy, and neither Nationwide nor Jones can presume that lay persons would know the difference. (Referee Morrison's Finding of Fact, No. 14.) For these reasons, I believe that Jones had reason to know that Employer would justifiably rely upon his representation that a portion of the $4,981 payment was for the retroactive "reinstatement" of Employer's policy.[2]

The Majority's contrary position assumes without reason that Employer has greater knowledge about insurance matters than the ordinary lay person: "Employer, as an ongoing manufacturing establishment, *presumably* has a higher level of sophistication in business matters, including insurance, than the ordinary consumer." (Majority op. at 171.) (Emphasis added.) Yet, this presumption is not supported by the record. In fact,

> No evidence of record indicates that [Employer] or the particular individual employees handling its insurance matters understood the difference between reinstated and reissued policies, and a common lay person would not be presumed to understand that distinction, particularly in light of the history of curing defaults by late payments.

(Referee Seacrist's Finding of Fact, No. 9.) I agree with Referee Seacrist; indeed, Employer's history of defaulting, seeking the intervention of Jones and then curing the defaults by late payments demonstrates that Employer is not highly sophisticated in insurance matters. Like every other common lay person, Employer relies on its insurance

**2.** My conclusion is not altered by the fact that Referee Morrison found that the audit bill "clearly stated that the total owed was for the period from May 30, 1985 to December 25, 1986" (Referee Morrison's Finding of Fact, No. 6) because Referee Seacrist found that the audit bill, as interpreted to Employer by Jones, did *not* clearly communicate that Nationwide had truly cancelled Employer's coverage and that Employer's

payment of $4,981 would not reinstate coverage. (Referee Seacrist's Finding of Facts, Nos. 6 & 10.)

Although the findings appear to conflict, Referee Morrison's finding concerns the audit bill on its face, whereas Referee Seacrist's finding concerns the audit bill viewed in light of Employer's dealings with Jones.

agent to take care of its insurance coverage. It is not the role of this court here to presume facts not in the record in order to support a particular result.

### 3. Detriment

Finally, I also believe that Employer relied to its detriment on the representation made by Jones. The Majority offers two arguments in opposition to this view. First, the Majority maintains that such payment does not constitute a detriment because the $4,981 was a lawful debt to Nationwide.[3] (Majority op. at 1171.) However, there is no prohibition in law that forbids two parties from negotiating a settlement of their debts for an amount less than originally agreed to. Here, through Jones, Nationwide agreed that Employer could settle all of its debts to Nationwide and continue coverage,[4] just as Employer had done in the past under the instruction of Jones, by payment of a sum of money ($4,981) by a certain date (January 30, 1987).

Second, the Majority asserts that Employer could not have detrimentally relied upon the representation of Nationwide because the representation was made *after* the January 7 and January 9, 1987 injuries. However, the date of the representation is irrelevant where Nationwide agreed to *retroactively reinstate* Employer's insurance coverage upon Employer's payment of $4,981 by January 30, 1987. Thus, I do not find either of the Majority's arguments persuasive.

Employer relied on Nationwide's promise to reinstate coverage when, on January 30, 1987, Employer made the $4,981 payment.[5] However, because Nationwide failed to reinstate Employer's coverage after receiving Employer's payment, Employer never received the benefit of the bargain and, thus, relied on the representation of Jones to its detriment.

### B. Apparent Authority

I turn now to Claimants' contention that Nationwide knew or should have known that the representation of Jones would reasonably induce lay people to believe that Jones could bind Nationwide to ongoing coverage. Once again, I must disagree with the Majority which, ignoring that the issue here is *apparent* authority, rejects this argument because Jones did not have *actual* authority to unilaterally reinstate workmen's compensation insurance coverage.

Section 27 of the Restatement (Second) of Agency states the general rule for the creation of apparent authority:

> Except for ... conduct of transactions required by statute to be authorized in a particular way, apparent authority to do an act is created as to a third person by ... *conduct of the principal which, reasonably interpreted, causes the third person to believe* that the principal consents to have

3. Thus, the Majority rests its position on a particular version of the pre-existing duty rule which, in this context, has a long and checkered past. The doctrine's origin has been traced to *Pinnel's Case*, 5 Coke 117, where Lord Coke, in the year 1602, stated in dictum that payment of a lesser sum in satisfaction of a greater cannot be satisfaction of the whole. In 1884, this dictum was put to the test in *Foakes v. Beer*, 9 App.Cas. 605 (1884), where the House of Lords ruled that even a bargained for lesser payment could not discharge an entire obligation because the debtor had only done what he was legally obligated to do. *See* John D. Calamari and Joseph M. Perillo, The Law of Contracts 211 (1987) [hereinafter Calamari].

After *Foakes*, the rule was so persistently criticized that courts eagerly searched for some kind of detriment in order to further justice. *See* Calamari. If there was any legal possibility of benefit to the creditor, that additional weight tipped the scale in support of the modified agree-

ment. *See Jaffray v. Davis*, 124 N.Y. 164, 26 N.E. 351 (1891). Some states even passed legislation to avoid the rule, which was characterized by various courts as "rigid," "technical," "not very well supported by reason" and "old law." *See Jaffray*. Here, the Majority clings to the "old law," failing to adopt the modern view as expressed in the Restatement (Second) of Contracts and relying instead on a 1938 case to support its position.

4. Jones represented that Employer's payment of $4,981 by January 30, 1987 would not only act to satisfy past due amounts but also would serve as a 30% down payment on a 1986–87 policy, thereby effecting the retroactive reinstatement of Employer's coverage.

5. Nationwide's promise was also supported by adequate consideration. Because Employer is insolvent, this renegotiated agreement enabled Nationwide to avoid the burden of debt collection.

the act done on his behalf by the person purporting to act for him.

Restatement (Second) of Agency § 27 (1958).

The Majority maintains that there is nothing in the record to establish that Nationwide acted in such a way as to make Employer reasonably believe that Jones had authority to reinstate Employer's workers' compensation insurance policy. (*See* Majority op. at 172.) However, my examination of the record indicates otherwise. The record shows that Nationwide allowed Employer, through Jones, to cure defaults by making late payments. (Referee Seacrist's Finding of Fact, No. 5.) Indeed, Employer testified that, even though Jones was aware of the December 25, 1986 cancellation notice, Jones nevertheless instructed Employer on January 16, 1987 to send two months of unpaid premiums ($514) to Nationwide, presumably to once again cure the default. (Referee Morrison's Findings of Fact, Nos. 3 and 4.) Jones did not deny giving these instructions to Employer. (Referee Morrison's Finding of Fact, No. 14.)

In addition, the record shows that there were two direct contacts between Employer and Nationwide. The first contact occurred on January 12, 1987 when Employer telephoned Nationwide to ask whether Employer should file a separate form for each of the claimants injured between January 7 and January 9, 1987. Nationwide did not inform Employer at that time that Employer's coverage had been cancelled; rather, Nationwide provided information to facilitate Employer's filing of the workmen's compensation claims. Second, on February 3, 1987, Employer telephoned Nationwide to actually report Claimants' injuries. Nationwide accepted the information but failed to inform Employer that its coverage had been cancelled. (Referee Seacrist's Finding of Fact, No. 7.)

The Majority's position is that these contacts only involved the filing of claims with Nationwide, not the reinstatement of Employer's insurance coverage. (Majority op. at 172.) But, in this respect, the Majority misses the point. These contacts with Nationwide, where Nationwide actually took information regarding the January 7 and January 9, 1987 claims, would reasonably lead Employer to believe that Jones had the apparent authority to reinstate Employer's coverage.

Thus, I believe that Employer reasonably interpreted Nationwide's conduct to mean that Jones had correctly represented that Employer's coverage had been "reinstated" to cover the last few days of 1986 and all of 1987. Indeed, not until February 5, 1987 did Nationwide act to clearly inform Employer that its workmen's compensation coverage had been cancelled.

## II. SUPERSEDEAS FOR MEDICAL EXPENSES

### A. Mootness

Next, I would consider whether the Board had authority to grant Nationwide a supersedeas for medical expenses. The Majority declines to address this issue because its holding renders the matter moot. However, this court will decide an issue, even when moot, where the question is one that is capable of being repeated and of continuing to escape review. *Cumberland Publishers, Inc. v. Carlisle Area Board of School Directors,* 166 Pa.Commonwealth Ct. 176, 646 A.2d 69 (1994). Likewise, our Supreme Court will address matters that are moot where the question is capable of repetition and is of sufficient public importance that it ought not to escape appellate review. *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 368 A.2d 675 (1977).

Here, I note that the Board will continue to receive requests for supersedeas with respect to medical expenses. Each time the Board denies the request, the matter escapes appellate review. Each time the Board grants the request and the claimant wins, the matter escapes appellate review. Each time the Board grants the request and the claimant loses, but declines to appeal, the matter escapes appellate review. For these reasons, and because I believe that the question is of sufficient public importance that it ought not escape our review here, I would address the issue.

## B. Supersedeas

Claimants contend that the Board lacks authority under the Act to grant a supersedeas for medical expenses in the same way that referees lack authority under The Pennsylvania Workmen's Compensation Act (Act)[6] to grant a supersedeas for medical expenses. *See ADIA Personnel Agency v. Workmen's Compensation Appeal Board (Coleman)*, 137 Pa.Commonwealth Ct. 405, 586 A.2d 507, *appeal denied*, 528 Pa. 624, 597 A.2d 1154 (1991).

In *ADIA Personnel Agency*, we considered whether Section 306(f) of the Act authorizes a referee to grant a supersedeas for medical expenses. Section 306(f)(2)(ii) provides in pertinent part:

> The employer shall have the right to petition the department for review of the necessity or frequency of treatment or reasonableness of fees for services provided by a physician or other duly licensed practitioner of the healing arts. *Such a petition shall in no event act as a supersedeas*, and during the pendency of any such petition the employer shall pay all medical bills if the physician or other practitioner of the healing arts files a report or reports as required by ... this subsection.

77 P.S. § 531(2)(ii) (emphasis added). We then noted that while the Act clearly states that there is no automatic supersedeas upon filing a petition to review medical treatment, we could find "no section" of the Act that authorizes a discretionary supersedeas as to the payment of medical expenses. *ADIA Personnel Agency*. Accordingly, we concluded that a referee is not authorized to grant a discretionary supersedeas for medical expenses. In reaching this result, we reasoned that a policy of cutting medical aid *before* an adjudication could seriously impair a claimant's right to receive immediate treatment for injuries. *Id.* We also considered that the supersedeas fund provides a statutory remedy for employers who were ultimately found to have no liability for medical expenses. *Id.; see also* section 443 of the Act, 77 P.S. § 999.

The Board, in granting Nationwide's supersedeas request for medical expenses, relied on *Travelers Ins. Co. v. Gunson*, 79 Pa.Commonwealth Ct. 39, 468 A.2d 529 (1983), *aff'd*, 506 Pa. 334, 485 A.2d 390 (1984). In *Travelers Ins. Co.*, this court held that section 430(b) of the Act provides authority for the Board to grant a supersedeas for compensation payments. Section 430(b) states:

> Any insurer or employer who terminates, decreases or refuses to make *any payment provided for in the Decision* without filing a petition and being granted a supersedeas shall be subject to a penalty as provided in Section 435, except in the case of payments terminated as provided in Section 434.

77 P.S. § 971(b) (emphasis added). The Board reasoned that because the payment of medical expenses under a referee's decision constitutes "any payment," the Board not only has authority to grant a supersedeas for compensation payments, but also has authority to grant a supersedeas for medical expenses under the Act. I disagree.

In *ADIA Personnel Agency*, we stated that "[s]ection 430 of the Act, 77 P.S. § 971, pertains to the effect of an appeal on a lien of judgment. However, no section within the Act authorizes a discretionary supersedeas as to payment of medical expenses." *ADIA Personnel Agency*, 137 Pa.Commonwealth Ct. at 408, 586 A.2d at 508. Clearly then, in *ADIA Personnel Agency*, we considered whether section 430 of the Act could authorize a discretionary supersedeas for medical benefits and concluded that *no section* of the Act authorizes such a supersedeas. Accordingly, I would hold that the authority granted to the Board under *Travelers Ins. Co.* applies only to a grant of supersedeas for compensation payments. The Board does *not* have authority under section 430 of the Act to grant a supersedeas for the payment of medical benefits.

## III. CONCLUSION

In summary, because I believe that Employer reasonably relied to its detriment upon Jones' representation that Nationwide

---

**6.** Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 1–1031.

had reinstated Employer's workers' compensation policy and because I also believe that Employer reasonably interpreted Nationwide's conduct to mean that Jones spoke on behalf of Nationwide, I conclude that Nationwide is estopped from denying that it retroactively reinstated Employer's coverage when Employer made a payment of $4,981 on January 30, 1987. Accordingly, I would reverse the decision of the Board as to Nationwide's liability. In addition, because I believe that the Board lacked authority to grant a supersedeas with respect to the payment of medical benefits, I would vacate the supersedeas.